UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| OLD PATHS BAPTIST CHURCH, et. al, )<br>)<br>Plaintiff,                            )<br>)<br>vs.                                         )<br>)<br>TROY MERRY, et. al,                )<br>)<br>Defendants.                          ) | 4:05-cv-79-SEB-WGH |

**ENTRY ON DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT**

**I.     Introduction**

This matter is before the Court on Defendants' June 29, 2007 Motion for Summary Judgment as to the claims of Plaintiff Costello (Docket Nos. 100-101); Defendants Ratts, Brown, Merry, Newcomb, Terrell and Chastain's Motion for Summary Judgment filed July 16, 2007 (Docket Nos. 104-108); Defendants Busick and Teusch's Motion for Summary Judgment filed July 16, 2007 (Docket Nos. 111-112), and Defendants Lyles and Schocke's Motion for Summary Judgment filed July 23, 2007 (Docket Nos. 115-116, 120).

**II.    Factual and Procedural Background**

Certain members and friends of the Old Paths Baptist Church ("Old Paths")

participated in demonstrations and street preaching on the downtown square of Salem, Indiana, on various occasions during 2003.  (Affidavit of Brian Ratts ("Ratts Aff.") ¶ 3).  In the course of one such demonstration on May 3, 2003, an altercation erupted between John Lewis, the pastor of Old Paths, and Galen Bowman, a spectator, which prompted a criminal investigation of their encounter.  ("John Lewis Second Aff.") ¶ 4-6; Second Affidavit of Ben Cochran ("Cochran Second Aff.") ¶ 40).[1]

One month later, on June 3, 2003, Kelly White ("White"), John Cook ("Cook"), Willie Costello ("Costello")  and Nathan Lewis participated in another Old Paths demonstration held again on the Salem town square.  (Ratts Aff. ¶¶ 11-17).  During the days immediately preceding that demonstration, the Salem Police Department received numerous complaints[2], both verbal and written, from members of the public who complained that the usual traffic patterns around the square were being impeded by these activities.  (Id. ¶ 5).[3]  However, surveillance of the demonstrations had been conducted by undercover Salem police officers which established otherwise. (Deposition of Nathan

---

[1]Criminal charges were eventually dismissed against John Lewis for lack of prosecutorial merit.

[2]In reality, many of the complaints leveled against the Old Paths protesters to the Salem Police Department related to the content of their message. (Ratts Aff. at Exs. 1-3).  For example, certain complainants objected to the signs carried by the Old Paths protesters which displayed images of aborted fetuses.  (Id.).

[3]Brian Ratts, Chief of Police of the Salem Police Department, explained:  "We got a lot of calls that would say, 'they're standing in the middle of the street banging my car with a sign or then they ran up and laid across my windshield.'  And when we went and investigated those we found that the majority of those were untrue that these things weren't happening that people were making a mountain out of a mole hill . . . ." (Ratts Dep. at 96).

Teusch ("Teusch Dep.") at 5, 18, 37; Deposition of Matt Busick ("Busick Dep.") at 18). In fact, a police presence had been maintained for nearly the entire time the demonstrations were underway, (Cochran Second Aff. ¶ 42), and no arrests or citations for obstruction of traffic occurred. (Id. ¶ 43).  Several police officers present during the demonstrations testified that they did not witness any obstruction of traffic by the protesters.  (Deposition of Troy Merry ("Merry Dep.") at 25-26; Deposition of Keith Williams ("Williams Dep.") at 32, 37; Deposition of Reggie Terrell ("Terrell Dep.") at 10; Deposition of Todd Combs ("Combs Dep.") at 24; Deposition of Brian Ratts ("Ratts Dep.") at 62, 72, 88; Busick Dep. at 17,18, 40; Teusch Dep. at 6).  In addition, during the demonstrations, pedestrians were permitted to be in the vicinity of the Old Paths protesters.  (Cochran Second Aff. ¶ 50; Deposition of Judy Chastain ("Chastain Dep.") at 14).

On June 3, 2003, Chief of Police Ratts was approached at the Salem Police Department by Salem resident David Lyles, who informed him that on the previous day (June 2) his dump truck had been struck by one of the signs carried by the Old Paths protesters. (Ratts Aff. ¶ 9).  David Lyles described the individual who had struck his vehicle as a male who had hair and a beard.  David Lyles did not accompany Ratts to the town square to make an in-person identification of the protester.[4]   (Deposition of David

---

[4]This conflicts with Ratts's police report which states that David Lyles did accompany him to the town square and specifically identified Costello, who is bald, as the man who struck his truck during the demonstration.  (Costello Response in Opposition to Motion for Summary Judgment at Ex. 11).

Lyles at 5-7).  Based on David Lyles's complaint and his description of a male with hair and a beard, Ratts went to the town square and was able to identify Costello as the possible suspect; Costello is bald and had no beard (Second Cochran Aff. ¶ 47).  Ratts requested that Costello provide him with his name, address, and date of birth and told Costello that he was being investigated for "a crime." (Ratts Aff. ¶ 10). (Costello Response in Opposition to Motion for Summary Judgment at Ex. 11).  Costello refused to provide the requested identification, whereupon Ratts arrested him for a violation of Indiana Code 34-28-5-3.5. (Ratts Aff. ¶ 11).  Costello allegedly was also investigated for obstruction of traffic, in violation of Indiana Code § 35-42-2-4, but apparently was never charged with that offense.

The controversy generated by the Old Paths protests prompted the Salem Police Department to surveil the Salem town square.  On June 2nd and June 3rd, Chief Ratts assigned two Indiana State Police Troopers, Nathan Teusch ("Teusch") and Matt Busick ("Busick"), to conduct surveillance in an undercover capacity.  (Ratts Aff. ¶ 13; Teusch Dep. at 5,18, 37; Busick Dep. at 8-13, 18.).   Teusch and Busick took photos of the protesters, and Salem Police Officer, Marlon Robertson,  videoed them. (Busick Dep. at 8-13; Teusch Dep. at 21,22; Deposition of Marlon Robertson at 4-6).  Trooper Busick told certain protesters that he was taking pictures for the local newspaper. (Busick Dep. at 10-11).  In his deposition, Busick provided the following rationale for photographing the protest:  "I'd say [Ratts] had problems . . . in the past with the

community and the protesters and the protesters and the community, and this was more of a cover to see who was there protest-wise and who was there community-wise if any problems did arise later." (*Id*. at 12). Busick also explained that the officers sought to secure "photos of unknown subjects." (*Id*. at 11). Neither Busick nor Teusch reported any incidents of traffic obstruction by any of the Old Paths protesters. (*See* Teusch Dep. at 6; Busick Dep. at 10).

After ordering surveillance of the town square, Chief Ratts undertook his own investigation of earlier reports of traffic obstruction alleged to have been committed by all of the protesters in general, but by no one in particular. (Ratts Dep. at 7). Beginning at approximately 12:00 p.m., Chief Ratts approached Matt Caudill who, in response to the Chief's request, presented Ratts with identification. (Second Cochran Aff. ¶ 22). Ratts next approached Nathan Lewis and asked him for similar identifying information, i.e., his name, address and date of birth. (Ratts Aff. ¶ 14). Nathan Lewis also complied, and Ratts thanked him for his cooperation. (*Id*.). Ratts never advised Nathan Lewis that he was being investigated for a possible infraction or ordinance violation or that he was being arrested or cited for any violation of law. (*Id*.).

Chief Ratts then approached John Cook and requested similar identifying data, in response to which Cook provided his name and post office box address. (Ratts Aff. ¶ 15; Deposition of John Cook ("Cook Dep.") at 19-21, 33). Chief Ratts's initial contact with Cook occurred at 12:04 p.m., and he did not return for further follow-up

investigation of Cook until 2:23 p.m. (Second Cochran Aff. ¶ 22). When Ratts requested Cook's information a second time, Cook refused to provide his date of birth. Chief Ratts apparently never asked to see Cook's driver's license which would have contained the identification information. (Ratts Aff. ¶ 15). Chief Ratts also never informed Cook that he was suspected of committing an infraction or ordinance violation. Based on Cook's refusal to provide his date of birth in response to the request of law enforcement, Chief Ratts placed Cook under arrest. (*Id.*).

In the course of his arrest[5], Cook explained to Chief Ratts that he did not want Ratts to get his money, so he removed his wallet from his back pocket and tossed it to Nathan Lewis who was standing nearby. (Ratts Aff. ¶ 16). (Second Cochran Aff. ¶ 22). Nathan Lewis caught the wallet just as Ratts instructed him not to touch it, whereupon Lewis to respond, "What do you mean 'don't touch the wallet?'" He then surrendered it to Chief Ratts. (*Id.* ¶ 23). For some unexplained reason, at this juncture Chief Ratts instructed Salem police officer, Troy Merry ("Merry"), to arrest Nathan Lewis and, as Merry led Nathan Lewis away, Merry placed an arm bar on Lewis, causing him to shout out repeatedly, "I'm not resisting!" (*Id.*; Ratts Aff. ¶ 16). Officer John Newcomb ("Newcomb"), who was at that time on duty wearing plain clothes, rushed out of the crowd to assist Officer Merry and slammed Nathan Lewis to the pavement, causing abrasions to Lewis's face. (Second Cochran Aff. ¶ 23).

---

[5]Plaintiffs contend that this incident was videotaped from at least three, separate, vantage points.

Significantly, no police officer up to this point had ordered Nathan Lewis to get on the ground.  (*Id.*).  Nathan Lewis was thereafter charged with a violation of Indiana Code Section 35-42-2-1 for battery on a police officer, as well as a violation of Section 35-44-3-3 for resisting law enforcement.

After Nathan Lewis was arrested by Officer Merry, Kelly White, another protester who was located approximately 30-feet away, dropped his placard and moved quickly to assist Nathan Lewis as he lay on the asphalt surface after being forcibly placed there by non-uniformed officers, providing no appearance of actually being police officers.  (Second Cochran Aff. ¶ 24).  Chief Ratts, from approximately 20-feet away, moved quickly to intercept Kelly White and applied a double forearm blow to White,  knocking him off balance, after which he was tackled by Troopers Teusch and Reggie Terrell ("Terrell").  (Second Cochran, Aff. ¶ 24).   White was later charged with violating Indiana Code § 35-42-2-1, battery on a police officer, and Indiana Code § 35-44-3-3, resisting law enforcement.  (Ratts Aff. ¶  19; Terrell Aff. ¶ 5; White Dep. at 99, 103, 147).

Following their arrests[6], Plaintiffs Costello, Cook, White and Lewis each filed lawsuits consisting of various claims against these defendants, including that: 1) the officers violated their First Amendment rights of freedom of speech and religion; 2) because their arrests lacked probable cause, the officers violated their

---

[6]At a status conference conducted on December 12, 2007, the parties represented to the Court that each Plaintiff had been acquitted on all charges, either as a result of a directed verdict or by a jury verdict following trial.  (See Docket No. 159).

Fourth Amendment rights; 3) the officers' actions violated their due process rights under the Fifth and Fourteenth Amendments; 4) the officers' actions violated the Indiana Constitution, including Article 1, Sections 2, 11, and 12; 5) their arrests constituted false imprisonment; and, finally, 6) all of the Defendants conspired together to violate Plaintiffs' First Amendment rights.

The Defendants seek summary judgment on all the claims against them, contending that each of the arrests was supported by probable cause, that there were no violations of First Amendment rights, that the officers are entitled to qualified immunity, that the claims brought under Indiana statutes lack evidentiary support, and that Plaintiffs have failed to adduce sufficient evidence to demonstrate the existence of a conspiracy. Given the numerous factual disputes surrounding the occurrences of June 2 and 3, 2003, on the Salem town square, we shall limit our attention here only to the issue of qualified immunity.

### III.    Legal Standard

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The motion shall be granted when no rational fact finder could return a verdict in favor of the nonmoving party. *See Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict, as the question essentially for the court in both contexts is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  When ruling on such a motion, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in that party's favor.  *Id.* at 255.  If the nonmoving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial."  FED.R.CIV.P. 56(e); *see also Silk v. City of Chicago,* 194 F.3d 788, 798 (7th Cir. 1999).  Finally, the moving party need not positively disprove the nonmovant's case; rather, it may prevail by establishing the lack of evidentiary support for that case.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**IV.     Analysis**

As we have previously noted, significant factual disagreements surround the dispute between Plaintiffs and Defendants in this lawsuit.  The issue of qualified immunity, however, deserves a prompt resolution, given its possible effect on any remaining proceedings.

"Police officers performing discretionary functions--such as determining whether

they have probable cause to arrest--enjoy qualified immunity from suit unless it would have been clear to a reasonable police officer that, given the situation [the officer] confronted, [their] conduct violated a constitutional right." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 761 (7th Cir. 2006). When a police officer raises the immunity defense of qualified immunity, courts are to engage in a two-step analysis. "[T]he first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established, the question whether the right was clearly established must be considered . . . ." *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L. Ed.2d 272 (2001). A right is "clearly established" if a reasonable police officer would have known that his/her actions were unconstitutional. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d at 761. If the answer to both of these questions is "yes," then an individual officer is not entitled to qualified immunity.

The Supreme Court has emphasized that issues of qualified immunity are to be addressed at the earliest possible stage of a litigation. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L. Ed.2d 589 (1991)(*per curiam*). Expeditious consideration is required because "[q]ualified immunity is an entitlement not to stand trial or face the other burdens of litigation. The privilege is an immunity from suit rather than a mere defense to liability; and, like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Katz*, 533 U.S. at 200-01 (internal citations and quotations omitted).

A. The Arrests of Costello and Cook:

Viewing the facts in the light most favorable to Plaintiffs Costello and Cook, and drawing all reasonable inferences from those facts in their favor, the Court concludes that none of the defendants who are named in those claims is entitled to qualified immunity. Costello and Cook were both initially investigated ostensibly based on citizen complaints that certain, unidentified protesters were obstructing traffic.

Indiana Code Section 35-42-2-4 prohibits obstruction of traffic, providing in applicable part as follows:

> (a) A person who recklessly, knowingly, or intentionally obstructs vehicular or pedestrian traffic commits obstruction of traffic, a Class B misdemeanor.
> (b) The offense described in subsection (a) is:
>    (1) a Class A misdemeanor if the offense includes the use of a motor vehicle; and
>    (2) a Class D felony if the offense results in serious bodily injury.

IND. CODE § 35-42-2-4. Under this statute, obstruction of traffic is a misdemeanor.

When Costello was first approached by Chief Ratts for obstruction of traffic, Ratts had not been observed him commit any such violation; recall that the complained of incident had occurred the day prior to his arrest. In addition, Costello did not fit the description of the alleged violator, according to the complainant, David Lyles. These investigative disconnects notwithstanding, Chief Ratts nonetheless approached Costello and requested his identification.

Indiana Code Section 34-28-5-3 allows an officer to inquire as to an individual's identification under specific, but limited circumstances:

> Whenever a law enforcement officer believes in good faith that a person has committed an infraction or ordinance violation, the law enforcement officer may detain that person for a time sufficient to:
>
>     (1) inform the person of the allegation;
>     (2) obtain the person's:
>         (A) name, address, and date of birth; or
>         (B) driver's license, if in the person's possession; and
>     (3) allow the person to execute a notice to appear.

IND. CODE § 34-28-5-3.

The evidence available to us here does not establish whether Chief Ratts informed Costello of the allegations against him or whether Ratts offered Costello the alternative procedure of displaying his driver's license as a means of providing his name, address, and date of birth. What is clear, however, is that, after Costello refused verbally to give his name, Chief Ratts immediately arrested him and charged him with a violation of Indiana Code Section 34-28-5-3.5. That statute imposes a duty on an individual to provide identification, as follows:

> A person who knowingly or intentionally refuses to provide either the person's: (1) name, address, and date of birth; or (2) driver's license, if in the person's possession; to a law enforcement officer *who has stopped the person for an infraction or ordinance violation* commits a Class C misdemeanor.

IND. CODE § 34-28-5-3.5. One of the elements of the offense of failure to provide identification is that the individual accused of failing to provide such identifying information must have been stopped by the police for an infraction or ordinance violation.

Here the evidence, viewed in the light most favorable to Costello, demonstrates that Chief Ratts had not done so.  Thus, there was no probable cause to arrest Costello for a violation of Section 34-28-5-3.5 because, at the time the identifying information was requested, Costello had not been stopped for an infraction or ordinance violation.  Indiana law does not authorize an officer to arrest a person for failure to identify himself/herself under the circumstances in which Costello found himself when confronted by the police.

Thus, with respect to Costello's claims, the only remaining question is: could a reasonable police officer have believed that there was probable cause to arrest Costello under these circumstances?  Again, the answer clearly is no.  Costello did not meet the description of the person identified by the witness, David Lyles, as the one whose placard struck his dump truck.  No reasonable police officer possessing only that descriptive information would have reasonably believed that probable cause existed to arrest Costello.[7]  Additionally, because Costello had not been stopped for an infraction or ordinance violation, no reasonable officer would have concluded that probable cause existed to arrest Costello for failure to provide identification in response to an officer's request identify.

The same is true with respect to Plaintiff Cook's arrest.  After the arrest of Costello, Chief Ratts dispatched several officers to the town square to photograph the

---

[7]The Court also notes that Costello was never charged with obstruction of traffic, which further calls into question whether Chief Ratts had a good faith belief that Costello had committed any crime.

protesters so that, if required, names could be put with faces. No specific suspicions existed in Ratts's mind suggesting that Cook had violated any law; the photo surveillance was premised on law enforcement's generalized suspicion that some or all of the Old Paths protesters might have violated the law. Clearly, Chief Ratts never regarded Cook as a suspect with respect to such an offense. After Ratts requested identification from Caudill and Nathan Lewis, which they each supplied without incident, Ratts made a similar request of Cook, who partially complied by providing his name and address. As with Costello, no evidence exists to establish that Chief Ratts ever informed Cook that he was suspected of committing an infraction or ordinance violation. And, although he was arrested for failing to provide his identification, Cook was never charged with obstructing traffic.

All of these facts demonstrate that Chief Ratts lacked a good faith belief that Cook had committed any ordinance violation or infraction. Because Chief Ratts lacked such a good faith belief that Cook had committed an infraction or ordinance violation, he had no probable cause to arrest Cook based only on his failure to inform Ratts of his date of birth. Accordingly, there was no probable cause to arrest Cook and no reasonable police officer would have believed that there was probable cause to arrest Cook.[8] A reasonable officer is familiar with the elements of the offense for which an arrest is being made and

---

[8]It is also important to note that, even if there were probable cause to believe that Cook committed the misdemeanor of obstructing traffic, no arrest would have been permissible without a warrant because an officer does not have authority to arrest without a warrant unless a misdemeanor is committed in his presence.

cannot arrest a person without probable cause to believe that the person actually committed that crime.  The actions of each of the officers who participated in Cook's arrest thus acted beyond the bounds of the protections of qualified immunity.

B. Nathan Lewis' Arrest:

As with all the plaintiffs' cases, there are significant factual disputes surrounding Nathan Lewis's arrest as well.  According to Plaintiffs' version of the facts, during the course of his arrest Cook tossed his wallet to Nathan Lewis for safekeeping, and, when Lewis caught it, he was  promptly arrested.  Based on his truly happenstance involvement in this incident by catching Cook's wallet when it was thrown to him, Lewis was himself arrested and charged with battery on a police officer and resisting law enforcement.  However, witness testimony (and allegedly a videotape chronicling the incident) established that Nathan Lewis never engaged in any physical contact whatsoever with Chief Ratts or any other police officer.  An individual can be found guilty of battery only if he "knowingly or intentionally touches another person in a rude, insolent, or angry manner . . . ."  IND. CODE § 35-42-2-1.  Because Nathan Lewis never touched Ratts, no battery could be deemed to have occurred, making an arrest of Lewis for battery lacking in probable cause.  Further, no reasonable police officer would have believed that probable cause existed under these circumstances.  Similarly, no probable cause existed for the arrest of Nathan Lewis for resisting law enforcement.  The undisputed evidence establishes that Lewis never forcibly resisted, obstructed or interfered with any

law enforcement officer.  Ben Cochran testified that a plain clothes officer had forced Nathan Lewis to the ground.  In crediting Plaintiffs' version of the facts as we must,  no probable cause could have existed for an arrest of Nathan Lewis for resisting law enforcement.  Without some form of forcible resistence, interference or obstruction  byNathan Lewis, no reasonable police officer could have believed that probable cause existed to support a charge of resisting law enforcement.  Qualified immunity is, therefore, not available to the officers who effected Nathan Lewis's arrest on either of the charges against him.

### 3.  Kelly White:

Finally, once again taking the facts in the light most favorable to Kelly White, the evidence establishes that White ran toward his friend, Nathan Lewis, after observing that he had been slammed to the ground by an non-uniformed individual and that he then incurred a double forearm blow from Chief Ratts and tackled by two police officers.  Nothing in these facts supports a finding of probable cause to believe that White committed battery on a police officer justifying his arrest.  The evidence to support such a charge must establish that White *knowingly or intentionally* touched an officer in a rude, insolent or angry manner.  Quite the contrary: White neither instigated nor invited any contact with or from any police officer, nor did he knowingly touch an officer in a rude, insolent or angry manner.  No reasonable officer could have concluded on the basis of these uncontroverted facts that probable cause existed for the arrest of White for battery.  And the same must be said regarding the

charge against White for resisting law enforcement. Ben Cochran testified that he witnessed Nathan Lewis being tackled by the police officers immediately after Chief Ratts had initiated contact with Lewis. Cochran maintains that videotape evidence corroborates the conclusion that when White attempted to come to the aid of Lewis, Lewis did not forcibly resist, obstruct, or interfere with any officer. Therefore, no probable cause existed to arrest Lewis for that offense. And a reasonable police officer would have known that an arrest for the offence of resisting law enforcement cannot be made in the absence of evidence of forcible resistence, obstruction or interference. Hence, the officers who arrested White similarly are not entitled to qualified immunity.

## V.     Conclusion

For the reasons outlined above, the Court concludes that each of Defendants' Motions for Summary Judgment based on qualified immunity is **DENIED**. Given the abundance of disputed facts underlying all the other claims, summary judgment is not available; the fact that the parties' briefs filed in conjunction with these motions totaled 392 pages and the tendered evidence consumed some 502 pages buttresses our conclusion. A dispute of such magnitude obviously requires a jury to sort out and resolve the facts. The Motions, accordingly, are each **DENIED**. The case remains set for a trial before the undersigned judge on June 2, 2008, and a settlement conference with Magistrate Judge Hussmann shall occur on March 28, 2008.

**IT IS SO ORDERED.**

**Dated:** 01/25/2008

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

**Electronic copies to:**

Dale William Arnett
larnett1@verizon.net

Donald G. Banta
INDIANA STATE ATTORNEY GENERAL
Donald.Banta@atg.in.gov

Stacy Kerns Harris
RUDOLPH FINE PORTER & JOHNSON
skh@rfpj.com

Juliana B. Pierce
INDIANA STATE ATTORNEY GENERAL
Julie.Pierce@atg.in.gov

Ross E. Rudolph
RUDOLPH FINE PORTER & JOHNSON
rer@rfpj.com

Andrew P. Wirick
HUME SMITH GEDDES GREEN & SIMMONS
awirick@humesmith.com